UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | | |
|---|---|---|---|
| IN THE MATTER OF THE APPLICATION OF THE | | ) | |
| UNITED STATES OF AMERICA FOR A SEARCH | | ) | |
| WARRANT TO EXAMINE THE FOLLOWING | | ) | |
| TELEPHONES SEIZED ON OCTOBER 5, 2015: | | ) | |
| | | | |
| 1. | Iphone: IMEI 359239060807568 | ) | 15-mj-4358-DHH |
| 2. | Iphone: IMEI 354406063005293 | ) | 15-mj-4359-DHH |
| 3. | Iphone 6S: Model A1688 FCC ID:BCG-E2946A | ) | 15-mj-4360-DHH |
| 4. | Samsung Galaxy S6 Edge: IMEI 359715/06/189334/3 | ) | 15-mj-4361-DHH |
| 5. | Samsung Galaxy: | ) | 15-mj-4362-DHH |
| | IMEI: 356302/06/119542/6.5/N-R28G31YC1ZX | ) | |
| 6. | Samsung Flip Phone: IMEI: 355166/05/180737/8 | ) | 15-mj-4363-DHH |
| | | ) | |
| THE FOLLOWING SIM CARDS, SEIZED | | ) | |
| ON OCTOBER 5, 2015: | | ) | |
| | | ) | |
| 1. | Verizon Sim: 89148000001755017133 | ) | 15-mj-4364-DHH |
| 2. | AT&T Sim: 89014104278135701995 | ) | 15-mj-4365-DHH |
| 3. | Claro Sim: 89010201214233163226 | ) | 15-mj-4366-DHH |
| 4. | Claro Sim:  No identifying numbers | ) | 15-mj-4367-DHH |
| 5. | Unknown Sim: 34569821401050400G001 | ) | 15-mj-4368-DHH |
| | | ) | |
| THE FOLLOWING PHONES SEIZED ON | | ) | |
| OCTOBER 7, 2015: | | ) | |
| | | ) | |
| 1. | Apple Iphone 6s: IMEI 359234068543455 | ) | 15-mj-4379-DHH |
| 2. | Blackberry Bold PIN 2ABBCF64: IMEI 351504054241886) | | 15-mj-4406-DHH |
| 3. | Apple Iphone: IMEI 013852000873405 | ) | 15-mj-4407-DHH |
| | | ) | |
| AND THE FOLLOWING PHONES SEIZED ON | | ) | |
| OCTOBER 13, 2015: | | ) | |
| | | ) | |
| 1. | Samsung T-Mobile flip phone: IMEI 012944/00/912762/7 | ) | 15-mj-4408-DHH |
| 2. | Apple Iphone: IMEI 990002774834475 | ) | 15-mj-4409-DHH |

**<u>AFFIDAVIT OF MARK J. CONCANNON</u>**

I, Mark J. Concannon, Special Agent, a Task Force Officer with the U.S. Drug Enforcement Administration ("DEA") being duly sworn, depose and state:

1.      I am a Massachusetts State Police Trooper assigned to the Division of Investigative Services, Narcotics Unit, and I have been assigned as a Task Force Officer ("TFO") with the DEA since October 2012.  I am currently assigned to the DEA Boston Tactical Diversion Squad located in Boston, Massachusetts.  I am a graduate of the Massachusetts State Police Academy and have been a police officer since 2005.

2.      As a DEA TFO, I am an investigative or law enforcement officer of a State, within the meaning of 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations for offenses enumerated in 18 U.S.C. § 2516, which include violations of federal narcotics laws in violation of Title 21 of the United States Code.  In 2003, I graduated from the Massachusetts Criminal Justice Training Council basic reserve intermittent academy.  In 2005, I graduated from the Massachusetts State Police Academy.  As a Massachusetts State Trooper, I was initially assigned to patrol out of the Danvers and Norwell Barracks, and then to the Community Action team in the city of Brockton working in a high crime area focusing on gang and drug activity.  In October of 2012, I was re-assigned to the Division of Investigative Service and assigned to the Drug Enforcement Administration ("DEA") working as a task force officer in the Boston Tactical Diversion Squad.  I have a Bachelor of Science degree in Criminal Justice from the University of Massachusetts, Lowell.  I have attended numerous narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

3.      My duties include, but are not limited to, the investigation of narcotics violations and offenses.  In the course of performing these duties as a state police officer, I have been

2

involved in narcotics purchases as an undercover officer.  I have participated in various aspects of narcotics investigations including controlled purchases, undercover purchases, and surveillance.  I have been involved in over 200 narcotics investigations leading to arrests which included heroin, cocaine, marijuana, oxycodone, and other controlled substances.  Through my training and experience, I am familiar with appearance, packaging, texture, and smell of many controlled substances.  I am familiar with the terminology used by both narcotics users and distributors of controlled substances and the manner in which they disguise the subject of their conversations and operations.  I have participated in joint investigations with the DEA, Federal Bureau of Investigation ("FBI"), and numerous state and local agencies. On the basis of my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations. I am also familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

4.     I have personally participated in the investigation discussed in this affidavit.  This involvement has included, among other things, debriefing cooperating sources and conducting surveillance.  I also am familiar with the facts and circumstances of this investigation from oral and written reports made by me, other agents of the DEA, and members of other federal, state and local law enforcement agencies who have assisted in this investigation.

5.     Because this affidavit is being submitted for the limited purpose of establishing probable cause for the search of telephones and sim cards seized in connection with arrests on October 5, 7, and 13, 2015,  I have not included each and every fact known to me and other law enforcement officers involved in this investigation, but only such facts necessary to establish

probable cause for the issuance of this warrant. Facts not set forth herein are not relied on in

reaching my conclusion that there is more than sufficient evidence to support the issuance of the

requested order.

## PURPOSE OF AFFIDAVIT

6.      I submit this affidavit to set forth probable cause in support of my application for

a search warrant authorizing the search for and seizure of evidence of the Target Offenses from

the following telephones that were seized from Cristian J. MARINO-CASTRO; Roberto

MEDINA-ALCANTARA; and Willan MENDEZ-LOPEZ during their arrest on October 5, 2015

(all part of N-23):

    1.      Iphone: IMEI 359239060807568
    2.      Iphone: IMEI 354406063005293
    3.      Iphone 6S: Model A1688 FCC ID:BCG-E2946A
    4.      Samsung Galaxy S6 Edge: IMEI 359715/06/189334/3
    5.      Samsung Galaxy IMEI: 356302/06/119542/6.5/N-R28G31YC1ZX
    6.      Samsung Flip Phone: IMEI: 355166/05/180737/8

And from the following SIM cards[1] that were found in a hidden compartment together with more

than three kilograms of cocaine and a loaded handgun in the black Honda Accord in which

MARINO-CASTRO, MEDINA-ALCANTARA, and MENDEZ-LOPEZ were driving on

October 5 (all part of N-23):

    1.      Verizon Sim: 89148000001755017133
    2.      AT&T Sim: 89014104278135701995
    3.      Claro Sim: 89010201214233163226

---

[1] A Subscriber Identity Module (SIM) card is a portable memory chip or a small circuit board used mostly in cell phones that operate on the Global System for Mobile Communications network. SIM cards hold the personal information of the account holder, including his or her phone number, address book, text messages, and other data. When a user wants to change phones, he or she can usually easily remove the card from one telephone and insert it in another compatible phone.

    4.      Claro Sim:  No identifying numbers

    5.      Unknown Sim: 34569821401050400G001;

And from the following phones that were seized from Jose FOLCHRIVERA and Andy AVILES, during their arrest on October 7, 2015, when they were driving a blue Honda Accord with a hidden compartment containing at least two kilograms of heroin and a loaded handgun:

    1.      Apple Iphone 6s, IMEI 359234068543455  (N-35)

    2.      Blackberry Bold PIN: 2ABBCF64, IMEI: 351504054241886 (N-30)

    3.      Apple Iphone, IMEI 013852000873405 (N-26);

And from the following phones seized from Juan Pena on October 13, 2015, who had previously made multiple sales of heroin to an undercover officer, and was arrested with heroin on his person:

    1.      Samsung T-Mobile flip phone, IMEI 012944/00/912762/7

    2.      White Apple Iphone, IMEI 990002774834475

Collectively, the above-referenced phones and SIM cards will be referred to as the ("Target Devices").

       7.      As discussed further below, probable cause exists to believe that the Target Devices will constitute or lead to evidence regarding offenses involving the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); the use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses"), as well as further identification of individuals who are engaged in the commission of the Target Offenses.

       8.      For the reasons set out in this Affidavit, I believe that each of the persons from whom the Target Devices were seized upon arrest were committing one or more of the Target Offenses at the time the Target Devices were seized.  Court authorized interceptions of

communications, and surveillance and investigation document that these individuals were in contact with each one another in connection with the commission of those offenses.  Information from the Target Devices as further set forth in Attachment A will help law enforcement uncover the actual identity of these individuals, identity of other additional criminal associates, including potentially suppliers, runners and customer/redistributors; and may lead to the identification of residences and stash locations.

## TARGET-SUBJECTS

9.     The persons in this investigation pertinent to the current requested warrants are as follows:

a.     **Juan PENA**, a/k/a Johny, a/k/a Johnny, a/k/a Rocca, a/k/a Miguel, DOB 4/23/1985, is a Hispanic male whose last known address is 74 Fernandez Circle, Randolph, Massachusetts.  PENA sold over 200 grams of heroin and over 300 oxycodone pills to an undercover officer in this investigation.  PENA is believed to be a mid-level distributor for a drug trafficking organization in the Randolph, Quincy, Everett, and Boston areas.  PENA has a prior criminal history that includes an open heroin distribution charge, operating under the influence of alcohol, larceny, and knowingly receiving stolen property.  PENA was using a telephone that was the subject of court authorized interceptions between August 11 and August 26, 2015.  PENA made multiple heroin sales to an undercover officer, obtained approximately 300 grams of heroin from FOLCHRIVERA on or about August 28, 2015, and was arrested on October 13, 2015 in a vehicle in possession of drugs.

b.      **FNU LNU** a/k/a Jose Fochrivera a/k/a Alberto (hereafter,
**FOLCHRIVERA**), 12 Quarry Lane, Malden, Massachusetts.  Based upon
intercepted calls, as discussed further below, FOLCHRIVERA is a drug
supplier to PENA.  FOLCHRIVERA was identified on a car stop as Jose
FOLCHRIVERA, of Puerto Rican descent, based on a driver's license he
provided.  Investigators believe he is using a false identity, and that he is
actually of Dominican descent. FOLCHRIVERA was using a telephone
that was the subject of court authorized interceptions between September
23, 2015 and October 7, 2015, when he was arrested in a car with over two
kilograms of heroin and a loaded handgun contained in a hidden
compartment.

c.      **Andy AVILES** is a Hispanic male who investigators believe also resided
at Quarry Lane in Malden, Massachusetts.  AVILES was arrested with
FOLCHRIVERA on October 7, 2015 in the blue Honda Accord with over
two kilograms of heroin and a loaded handgun in a hidden compartment.

d.      **Christian J. MARINO-CASTRO**, is a Hispanic male from the
Dominican Republic whose last known address is 2704 Kingsbridge B7,
Bronx, New York.  MARINO-CASTRO was observed in the Econo-
Lodge in Sharon, Massachusetts with FOLCHRIVERA and others before
he was arrested on October 5, 2015, in a Black Honda Accord with more
than three kilograms of cocaine, a loaded handgun, and false identity
packages in a hidden compartment.

7

e.      **Roberto MEDINA-ALCANTRA** is a Hispanic male, believed to be

either from the Dominican Republic or from Mexico, whose last known

address is Antwempe #17, Bruselly, Spain.  MEDINA-ALCANTARA

was observed in the Econo-Lodge in Sharon, Massachusetts with

FOLCHRIVERA and others before he was arrested on October 5, 2015, in

a Black Honda Accord with more than three kilograms of cocaine, a

loaded handgun, and false identity packages in a hidden compartment.

f.      **Willian MENDEZ-LOPEZ** is a Hispanic male, believed to be from the

Dominican Republic, with a last known address of 150 Burnside St. 1J,

Bronx, New York.  MENDEZ-LOPEZ was observed in the Econo-Lodge

in Sharon, Massachusetts with FOLCHRIVERA and others before he was

arrested on October 5, 2015, in a Black Honda Accord with more than

three kilograms of cocaine, a loaded handgun, and false identity packages

in a hidden compartment.

10.      The information on which this affidavit is based comes from intercepted calls,

specific location information from phones and vehicles, surveillance, and seizures during the

arrests on October 5, 7, and 13, 2015.

A.      On August 11, 2015, the Honorable Richard J. Stearns entered an order

authorizing the interception of wire communications on (781) 518-8430, a telephone used by

PENA, known in this investigation as Target Telephone #1.  15-MC-91252-RJS (under seal).

Interceptions began on August 12, 2015.

B.    On September 18, 2015, the Court authorized interception of wire communications to and from Target Telephone #2, (781) 534-4170, used by FOLCHRIVERA. 15-mc-91252-RGS.  Interceptions began on September 23, 2015.

## PROBABLE CAUSE

### Undercover Purchases of Narcotics

11.    I made multiple undercover buys from PENA that are summarized briefly below. UC means a buy by the undercover officer.  CS means a controlled buy by the specified confidential source(s) at my direction.  Most of the conversations were recorded, and the meets occurred primarily in Randolph, Massachusetts:

| Date | Drugs Purchased and by whom | Amount Paid |
|------|------------------------------|-------------|
| July 10, 2014 | UC: 20 grams heroin | $1,200 |
| August 21, 2014 | UC: 30 grams heroin | $1,800 |
| August 26, 2014 | UC: 200 oxycodone 30 mg pills | $5,300 |
| September 4, 2014 | UC: 225 oxycodone 30 mg pills (but shorted – only 175 provided) | $5,960 |
| September 23, 2014 | UC: 30 grams heroin | $1,800 |
| October 28, 2014 | UC: 30 grams heroin | $1,800 |
| December 10, 2014 | UC: 30 grams heroin | $1,800 |
| January 21, 2015 | UC: 30 grams heroin | $1,800 |
| March 12, 2015 | UC: 30 grams heroin | $1,800 |
| May 17, 2015 | PENA texts the UC to offer to sell drugs | Not purchased |
| June 24, 2015 | CS-4 and CS-5: 30 grams heroin | $1,800 |
| **Total UC/CS Buys** | **375 oxycodone pills (30 mg) 230 grams of heroin** | **$25,060** |

Each of the above-referenced undercover purchases were arranged with PENA over the telephone.

## Court Authorized Interceptions of Drug Trafficking Communications Over the Telephone Between PENA and FOLCHRIVERA.

12.     In connection with this investigation, court-authorization was obtained to intercept communications to and from telephones used by PENA (Target Telephone #1 or TT#1) and FOLCHRIVERA (Target Telephone #2 or TT#2).  Those intercepted calls provide probable cause to believe that the Target-Subjects used telephones in furtherance of drug trafficking. Forty-three calls and three texts were exchanged between TT#1 and TT#2 between August 11 and August 28, 2015.   The conversations were in Spanish.  The information set forth below is from draft translations and transcripts of those calls.  In addition, some punctuation has been added to make the draft transcripts more readable.   "U/I" means unintelligible.

### Target Telephone #1 (PENA's Phone)

a.     On August 12, 2015, PENA used TT-1 to call FOLCHRIVEA on TT-2 (Session 10), regarding obtaining drugs to distribute.  PENA said, in part, "get me at least 300 of…of what you are going to receive. . . .try for my profit to be the 50, so I can pay [U/I]…but I want the job to work at least with the two (2)…with the two and a half (2 ½)."  Based on my training and experience and knowledge of this investigation, I believe PENA was seeking to purchase at least 300 grams of a controlled substance.   I believe "with the two" or "with the two and a half" means the amount of cut PENA wanted to be able to add to the product.

b.     On August 16, 2015, FOLCHRIVERA used TT#2 to call PENA on TT#1 (Session 245) regarding the expected delivery of drugs and their quality.  In part, FOLCHRIVERA said, "he is coming down . . . my friends are coming on Saturday with the

load." FOLCHRIVERA also said, "It is original. . . .the thing is, that they charge me a little bit

more, but it is original."  In part, PENA said, "what we have to make sure is that we have control

of it, and not ruin it by adding stuff to it."  FOLCHRIVERA said, "I am not going to give you

bad stuff . . . he sent me work, and it has moved well every time.  But let's wait until this one

arrives, do you understand?  So I can see it with my own eyes, and then I'll tell you, 'Look, it's

deadly' because as soon as I see it, I'll know, do you understand me?"  Based on my training and

experience and knowledge of this investigation, FOLCHRIVERA explained to PENA that the

controlled substances were now not expected to arrive until Saturday, August 22, 2015.  He told

PENA that the product was "original," which I understand to mean that it was of high quality and

had not been diluted with cut.   PENA expressed concern about obtaining good quality product,

and FOLCHRIVERA reassured him that FOLCHRIVERA would personally examine the

product and confirm the product was "deadly," which in the context of this investigation, means

"very good."

       c.      On August 18, 2015, PENA used TT#1 to call FOLCHRIVERA on TT#2

(Session 381) regarding the anticipated delivery of drugs.  In part, FOLCHRIVERA said, "Damn

man! They sent me sand, dude."  PENA said, "Damn!  I'm giving my word dude…there are

people now who wants 150, dude."  After further conversation about the bad drugs, PENA said,

"Look, if you could get me something, somewhere…if you could at least get me 300 or

something dude."  FOLCHRIVERA said, "That is what I am telling you…that for tomorrow I

will go because I got together with the people and they gave me the picture and all of that….

The picture, I will bring it to one of my customers right now so he can check it."  Based upon my

training and experience and knowledge of this investigation, I believe "sand" means "dirt,"

which is street language for "poor product."  PENA pressed FOLCHRIVERA to find him 300

grams of heroin.  In the context of this conversation, I believe that "picture" means "sample," and that FOLCHRIVERA intended to take to a customer a sample to test to see if the product was good.  Based on my training and experience, rather than using chemical tests for purity of controlled substances, drug dealers often use their customers or addicts to "test" the product to determine its quality.

        d.      On August 26, 2015, (Session 722), FOLCHRIVERA called PENA and said, "That's here, tell me."  PENA said, "Head over here then." FOLCHRIVERA said, "What should I bring you?"  FOLCHRIVERA said, "Listen to what we are going to do….I am going to add 50 to 200 alright? And I'm going to bring you that to see how it moves."  PENA said, "But that 50 to 200…damn…that's not enough, bro…"  After some further discussion about the ratio, PENA said, "But is has to be 250 to 50, so it comes out good, because I want that stuff to work." FOLCHRIVERA said, "Alright then."  Based on my training and experience and knowledge of this investigation, FOLCHRIVERA and PENA were discussing the amount of cut to be added to the drugs that FOLCHRIVERA was bringing PENA, and PENA was concerned that the ratio of cut to the original drugs be smaller to ensure the product was high quality and customers would like it.

        e.      On August 26, 2015 (Session 746), PENA used TT#1 to call FOLCHRIVERA on TT#2 and asked FOLCHRIVERA how FOLCHRIVERA was "going to give it to me."  FOLCHRIVERA said, "Buddy! Yours is better."  PENA said, Okay, how did you do it then? 50 to 250?"  PENA said, "Well then call me, that I am waiting for you, that I have to let go of a couple of samples right away."  Based on my training and experience and knowledge of the investigation, PENA continued to question FOLCHRIVERA about quality, the delivery of

the product, and told FOLCHRIVERA that he had to give away some samples to potential customers.

      f.     Thereafter, various calls were intercepted between PENA and persons other than FOLCHRIVERA to whom PENA sought to sell the drugs obtained from FOLCHRIVERA.

### Target Telephone #2 (FOLCHRIVERA's Phone)

      13.     On September 18, 2015, authorization was obtained from the Honorable Dennis Saylor, IV to intercept communications to and from a prepaid T-Mobile cellular telephone assigned call number (781) 534-4170, used by FOLCHRIVERA (Target Telephone #2). Interceptions began on September 23, 2015, and terminated on October 7, 2015.

      a.     On September 23, 2015, FOLCHRIVERA used TT#2 to call 646-829-6111 (UM6111) (Session 10).  FOLCHRIVERA said, "I am gathering as much as I can, so that when they come, have it here for them, so they can give me something good, so we can work worry free."  UM6111 said, "So, as soon as I arrive in Boston, I will stop by and will give you something."  Investigators believe FOLCHRIVERA was collecting money to have available to buy additional drugs when the drugs arrived.  UM6111 said, "I have a question for you dude. What the fuck was that curtain? What the fuck was it that you added to it, because those junkies are scratching themselves." FOLCHRIVERA said, "That is a good curtain, sonny."  Investigators believe that "curtain" refers to "cut," and UM6111 was concerned the cut was bad.

      b.     On September 23, 2015 FOLCHRIVERA used TT#2 to call PENA on PENA's new number, 857-389-6431 (Session 16).  PENA said, "if you work want to work with him, then work with him. . . . But listen what he did to me.  I went with him to pick up some pills supposedly from one of his friends . . . and they supposedly took from him my $13,000, you

13

hear?" Later in the conversation, PENA said, "It was him that robbed me."  Investigators believe that PENA was warning FOLCHRIVERA that one of his possible re-distributors was not trustworthy.  During this conversation, the WhatsApp ring tone was heard in the background during the discussion of the $13,000 stolen from PENA.

c.      On September 25, 2015, UM6111 called FOLCHRIVERA on TT#2 (Session 52).  UM6111 said, "Tell me, nothing?"  FOLCHRIVERA said, "I already told you, a couple days, dude."  UM6111 said, "Yeah." FOLCHRIVERA said, "I will call you right away, forget about it…I am more in need that you are."  Investigators believe that FOLCHRIVERA was waiting on a shipment of drugs to arrive, and UM6111 hoped to obtain part of those drugs to sell.

d.      On September 27, 2015, (617) 991-0163 (UM0163) called FOLCHRIVERA on TT#2 (Session 136).  UM0163 said, "When are we going to be active? This week?"  FOLCHRIVERA said, "Like around the weekend." UM0163 said, "Damn." FOLCHRIVERA said, "Grab a lot, grab a lot when it gets here."  Investigators believe that FOLCHRIVERA expects to receive a shipment of drugs soon.

e.      On September 28, 2015, (774) 225-7393 (UM7393) called FOLCHRIVERA on TT#2 (Session 212).  In this call, FOLCHRIVERA described for UM7393 how to operate a hide in a car.  FOLCHRIVERA said "On the driver's side, sit down . . .and where the air is, you know the air vent, the one that is on the right hand side? . . . the little plastic that is like all around the radio? . . . you go down a little more, and then you are going to lift the little corner down there.  It is a plastic, you pull it a bit, then the plastic is going to lift." UM7393 said, "Oh… I got it!!!"  . . . "That is a really good hide."

f.      On September 30, 2015, FOLCHRIVERA used TT#2 to call (857) 308-9228 (Catires) (Session 270).  FOLCHRIVERA told Catires that "a guy died.  He owed me 50,000 pesos. . . . Supposedly he was sick and stuff, and they found him dead. . . . They call him Joise. . . . They found him with foam coming out of his mouth and stuff. . . . He probably overdose."  Catires said, "There is also a lot of the white stuff out there . . . they are giving it to me at 32, dude . . . I throw 30 at it, and get 37 back. . . .He told my mom that he had around 20 around of that.  They are going to kill Rolon pretty soon."  FOLCHRIVERA said, "If he keeps doing that, they are going to kill him, Catires."  Catires said, "That is why I always ask him to come and bring me this much, bring me two or three kilos, because when they kill him, who is going to come charge me?"  Investigators believe that FOLCHRIVERA discussed with Catires obtaining cocaine, "white stuff," and that "Rolon" was talking too much about the drug supply he had on hand, which could get him killed.

g.      On October 1, 2015, FOLCHRIVERA used TT#2 to call UM6111 (Session 291).  FOLCHRIVERA complained about UM6111 taking too long to arrive.  UM6111 said, "Do you want money or you don't want money?"  FOLCHRIVERA said, "Bring me at least 20 or 30 thousand dollars."  UM6111 said, "Ha, I wish I was at that level."

h.      On October 2, 2015, FOLCHRIVERA received a call from PENA on TT#2 (Session 373).  In this call, PENA said,  "Didn't you see the news last night? . . . DEA picked up a whole bunch of people that were…a Mexican cartel around here, you know?"  FOLCHRIVERA said, yeah, of that white stuff, dude."  FOLCHRIVERA and PENA discussed how certain product was "killing people."  PENA said, "Last night they were saying that 1,200 people have died since that stuff been around here."  FOLCHRIVERA said, "Bro, it's because

that's a poison." They then discussed how no one would want to work with that product as more people got arrested.

### September 29, 2015 Surveillance of FOLCHRIVERA

14.     On September 29, 2015, using intercepted calls, specific location information, and surveillance, agents observed FOLCHRIVERA meet with several suspected drug customers while driving the Target Vehicle.

a.     As indicated above, agents followed FOLCHRIVERA to El Dugout restaurant in Dorchester, Massachusetts.  FOLCHRIVERA parked his vehicle in the lot.  At approximately 2:15 p.m., FOLCHRIVERA placed a call to (857) 300-9560 and told an unknown male, "Monstron," that he was already there."  Monstron said he would be there "in five minutes."  At approximately 2:20 p.m., agents observed a blue Dodge Avenger pull into the lot and park beside FOLCHRIVERA's Vehicle.  Agents saw FOLCHRIVERA exit his car and walk to the driver's side window of the blue Dodge where he leaned inside.  After some additional conversation, the blue Dodge left the parking lot.

b.     At approximately 2:23 p.m., agents observed a gray Honda Pilot, MA registration NE69RJ, pull into the El Dugout parking lot and park next to FOLCHRIVERA's Vehicle.  Agents observed the driver of the gray Honda get out and walk to the front passenger side of FOLCHRIVERA's car, where he leaned into the vehicle and got a white object.  He then went back to his car and departed.

c.     At approximately 2:27 p.m., agents observed a different gray Honda Pilot, MA registration 659ZX1, pull into the parking lot and park next to FOLCHRIVERA's Vehicle.  Agents observed the driver of this car get out and walk to the front passenger side of the Target

Vehicle.  He pulled an object out of his right pants pocket and reached in the passenger side window of the Target Vehicle.  He then got back in his car and left.

Based on my training and experience, and knowledge of this investigation, the activities of FOLCHRIVERA in the parking lot of the restaurant on September 29, 2015 were consistent with narcotics trafficking, either exchanging drugs for money, or collecting monies which may have been owed him.

### October 5, 2015:  Arrest of MEDINA-ALCANTRA, MENDEZ-LOPEZ, AND MARINO-CASTRO; and Seizure of Telephones, SIM Cards, Four Kilograms of Cocaine and Handgun.

15.     On October 4, 2015, following intercepted calls in which FOLCHRIVERA made plans to meet a source of supply from New York, investigators followed FOLCHRIVERA from his residence at 12 Quarry Lane, Malden, Massachusetts, to the Econo Lodge Hotel in Sharon, Massachusetts, and observed him meet with individuals who went in and out of two specific hotel rooms and back and forth to two cars:  a black Honda Accord with a Pennsylvania dealer plate, and a black Infiniti with a New York registration.  Surveillance continued throughout the day and into the night on October 4.

16.     On October 4, 2015, multiple calls were intercepted between FOLCHRIVERA and a New York number believed to belong to Carlos QUESADA-VARMET, with a New York area code, one of the six individuals at the hotel besides FOLCHRIVERA.  Those calls included discussions about drug trafficking.  For example, FOLCHRIVERA placed a call to QUESADA-VERMET at approximately 4:57 p.m., and said "he took a little bit to test it."  QUESADA-VERMET said, "yes, that's fine."  FOLCHRIVERA said, "if it passes, he will take it all."  QUESADA-VERMET said, "yes, it is original, don't worry, and …there is a lot."  Based on my training and experience and knowledge of the investigation, FOLCHRIVERA and QUESADA-

VERMET were discussing the need for a customer to test a sample of the drugs, and assurance that the drugs were "original," or high quality.

17.     Early on October 5, 2015, surveillance was re-established at the hotel. Three persons, later identified as William MENDEZ-LOPEZ, Roberto MEDINA-ALCANTRA, and Christian MARINO-CASTRO, were observed moving between two rooms with QUESADA-VARMET and FOLCHRIVERA.   MENDEZ-LOPEZ, MEDINA-ALCANTRA, and MARINO-CASTRO entered the black Honda Accord.  Three other persons, including QUESADA-VARMET, entered the black Infiniti.  The two cars left the hotel together, and both pulled into a Mobile gas station on Route 1 in Sharon, Massachusetts.

18.     A Massachusetts state trooper stopped the black Honda Accord on Route 95 (Northbound) in Canton, Massachusetts.  The car had a Pennsylvania dealer plate.  On a Registry of Motor Vehicles query, the dealer plate did not register to an active dealership; Pennsylvania confirmed the dealer plate was not in the system.   The driver was unable to answer basic questions about where they were going, other than "Lawrence."  A K-9 unit was requested and, when walked around the car, alerted to the area in the front passenger footwell.  Upon further search, investigators found a hidden compartment in the car that contained approximately four kilograms of a powdery substance that tested positive for cocaine; and a .40 caliber Glock 27 with 10 rounds in the magazine.  In addition, inside the hidden compartment was an envelope containing three passport cards with the same picture and different names; a credit report and bills under different names wrapped around social security cards and credit cards with matching names (believed to be false identification packages), which were also seized.  The five SIM cards which are part of the subject of this Affidavit were wrapped in a sheet of paper, and also found inside the hidden compartment.  MENDEZ-LOPEZ, MEDINA ALCANTRA, AND

18

MARINOCASTRO were arrested, their phones and the SIM cards were seized, and state charges were brought for trafficking cocaine and illegal possession of a firearm.

19.     On October 4 and 5, 2015, FOLCHRIVERA continued to talk to PENA about available drugs and distributing those drugs.  For example, on October 4, 2015, at 4:21 p.m. (Session 589), PENA called FOLCHRIVERA on TT#2.  FOLCHRIVERA said, "I have something good for you."  PENA said, "Are you ready now?"  On October 5, 2015, at 1:47 p.m. (Session 665), PENA called FOLCHRIVERA on TT#2.  PENA said, "I came to bring my buddy a sample.  If he likes it, he will take it all." FOLCHRIVERA said, "Is what I'm telling you…it got a little weak man!"  PENA said, "but this is another guy who hasn't checked it.  I will give him a sample now, and he said that if he likes it, he wants 200, he's going to take it all."  PENA also said, "I mentioned it to a couple of people, but all people want is a little bit only." FOLCHRIVERA said, "Damn, I'm not into that."  Based on my training and experience and knowledge of this investigation, PENA and FOLCHRIVERA were concerned about the quality of the drugs brought by the New York source of supply, and they wanted to move large quantities at once.

### October 7, 2015: Arrest of FOLCHRIVERA and AVILES, and Seizure of More Than Two Kilograms of Heroin and a Loaded Handgun.

20.     On October 7, 2015, intercepted calls over Target Telephone #2 indicated FOLCHRIVERA was heading to Rhode Island to meet an unidentified source of supply. (Sessions 779, 781, 789, 801, 816, 817).  Surveillance followed FOLCHRIVERA and a second individual, later identified as Andy AVILES, to Pine Street, Central Falls, Rhode Island.  After FOLCHRIVERA left Central Falls, Rhode Island, he was stopped on Route 95 North in Walpole, Massachusetts by Massachusetts State police.  FOLCHRIVERA was driving, and

AVILES was in the passenger seat.  As a result of the motor vehicle stop, the blue Honda Accord

was towed to the Massachusetts Foxboro Police Barracks, and Trooper Matthew Hannigan

arrived with his K-9, Flash.  Flash alerted positively for narcotic odor inside the car.  A search

revealed a hidden aftermarket compartment under the rear passenger seat area.  Inside the hidden

compartment was approximately two kilograms of heroin, and a loaded handgun.  When the car

was searched, a black Blackberry phone was also found inside the car and seized (N-30).

21.     Soon after locating and seizing the heroin and the handgun, FOLCHRIVERA and

AVILES arrived at the barracks, along with the registered owner of the Honda, Marie Rodriguez.

FOLCHRIVERA and AVILES were placed under arrest based on the heroin and gun found in

the car.  The I-Phone was seized from FOLCHRIVERA (N-35) and from AVILES (N-26) and

the telephones were placed into evidence.  State charges were brought.  Thereafter a federal

complaint and arrest warrant was obtained for FOLCHRIVEA.

### October 13, 2015 Arrest of Juan PENA with Heroin

22.     Pursuant to an arrest warrant, on October 13, 2015, Juan PENA was arrested

inside a vehicle outside his residence.  At the time of his arrest, PENA had a few grams of heroin

on his person, in addition to two telephones, the Apple Iphone and Samsung T-Mobile flip

phone.

### Training and Experience Regarding Drug Trafficking
### and Cell Phone (and SIM card) Use.

23.     Based on my training and experience, I am aware that drug traffickers commonly

use cellular telephones in furtherance of their drug-trafficking activities and frequently "drop" or

change cellular telephone numbers and cellular telephones in an effort to thwart law

enforcement's use of electronic surveillance.  Sometimes SIM cards are switched between

devices for the same reason.  Many drug traffickers use more than one phone, and sometimes use phones to access the internet.  Often telephones contain identifying information, passwords, pictures, and other information about the identity of the user of the phone and his/her criminal associates.  I am familiar with the manner in which narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations, electronic text messages, and other means to facilitate their illegal activities.  Telephones are actively used to purchase and distribute drugs, arrange meets, negotiate prices, and otherwise carry out the activities necessary to move large quantities of drugs.  In this investigation, interceptions of telephonic communications confirm the routine use of telephones to accomplish the business of this drug trafficking organization.  In addition, the Target-Subjects were observed using multiple phones at different times..

24.     Based on the foregoing information, including the seizures of cocaine, heroin, loaded handguns; surveillance; and intercepted calls, I believe that there is probable cause to believe that evidence will be found relating to the drug distribution crimes on the phones and SIM cards seized during the October 5, 2015,arrest of **MEDINA-ALCANTRA** , **MARINO-CASTRO**, and **MENDEZ-LOPEZ** (N-23), the phones seized from the vehicle and October 7, 2015, arrest of **FOLCHRIVERA** and **AVILES**  (N-26, N-30, N-35), and the October 13, 2015, arrest of **PENA** (N-31, N-32).  I believe each of the telephones and SIM cards will contain evidence of the Target Offenses because the Target-Subjects were involved in buying and distributing large amounts of controlled substances.   I believe there is probable cause to believe that these phones will also contain, for example, recently called telephone numbers, pictures of members of the DTO, address books, contact information, and other information that is evidence of the Target Offenses, such as emails and text messages.

25.     Additionally, based on intercepted conversations and my training and experience, I believe that the Target Subjects used email and social networking sites to communicate with one another and other criminal associates.  I believe the Target Devices likely contain evidence in the form of audio, video, and photographic images as well as text communications that can help establish the full nature of their relationships and the frequency with which they communicated as well as direct evidence of the Target Offenses.

### CONCLUSIONS AND REQUEST

26.     Based on all of the foregoing, I believe that on and in the Target Devices there is probable cause to believe that the items set forth in Attachment A will be found.

_____
Mark J. Concannon
Task Force Officer
U.S. Drug Enforcement Administration

Subscribed and sworn to before me,
this 27th day of October, 2015

_____
HONORABLE DAVID H. HENNESSY
United States Magistrate Judge
District of Massachusetts

Attachment A

# ITEMS TO BE SEIZED

All records, in whatever form, and tangible objects that constitute evidence, fruits, and/or instrumentalities of drug purchase and distribution, as set forth below:

1.      Records of personal or business activities relating to the operation or ownership of any of the phones (such as user names, passwords, telephone records, notes, books, diaries, and reference materials).

2.      Records pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media.

3.      Records relating to drugs, drug proceeds, drug distribution, drug importation, money laundering, money transfers, ledgers, contact lists, price sheets, and related documents.

4.      Records and information identifying contact information for co-conspirators, communications made in furtherance of the conspiracy, and photographs and videos of co-conspirators.